### DAVIS & PLEASANTS v. COTTON STATES LIFE INS. CO.

(Circuit Court of Appeals, Fifth Circuit. March 27, 1916.)

#### No. 2846.

PRINCIPAL AND AGENT ☞41—BREACH OF CONTRACT—SUFFICIENCY OF DECLARATION.

A declaration in an action for breach of a contract by which plaintiffs were employed as agents to sell an issue of stock of defendant corporation on commission *held* to state a cause of action, where the contract as set out contained provisions making time of essence, and it was alleged that defendant failed to make advances and to pay commissions earned when due under the contract, and which were necessary to enable plaintiffs to prosecute the work, and that afterward defendant terminated the contract on the ground that satisfactory progress had not been made by plaintiffs.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. ☞41.]

In Error to the District Court of the United States for the Northern District of Mississippi; Henry C. Niles, Judge.

Action at law by Davis & Pleasants against the Cotton States Life Insurance Company. Judgment for defendant, and plaintiffs bring error. Reversed.

On July 12, 1913, the parties entered into a contract as follows:

"This agreement, made and entered into this day by and between the Cotton States Life Insurance Company, of Tupelo, Mississippi, a corporation duly chartered and organized under and by virtue of the laws of the state of Mississippi, hereinafter referred to as the 'Insurance Company,' and Davis & Pleasants, a copartnership composed of Frank P. Davis, of Tupelo, Mississippi, and Dan G. Pleasants, of Atlanta, Georgia, hereinafter referred to as 'special agents,' witnesseth:

"(1) That the said Insurance Company has, by due and legal process and by proper action and approval of its officers and board of directors, been authorized to increase its capital stock fifty thousand dollars ($50,000.00), making a total capital stock of one hundred and fifty thousand dollars ($150,000.00), the par value of the shares being ten dollars ($10.00) each.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"(2) That the said Insurance Company is desirous of selling the said additional stock for not less than twenty-five dollars ($25.00) per share, receiving the amount of $4.50 for each share that is approved and accepted by said Insurance Company, and also upon further conditions, terms, and stipulations hereinafter contained."

"(4) The said Insurance Company and the said special agents therefore hereby mutually agree as follows: That the said Insurance Company does hereby appoint said Davis & Pleasants its special agents, and agrees that said special agents shall have the exclusive sale of five thousand shares of said new issue of stock, provided the sales are satisfactory to the said Insurance Company. Said stock to be sold by said special agents at twenty-five dollars ($25.00) per share. It is further agreed that said Insurance Company will not accept or approve of any subscriptions or settlements sent in by the said special agents that show less than one-fourth (¼) in cash, and note or notes for any portion of said subscription due later than six months after date. The said special agents also agree to remit the full settlement of not less than one-fourth (¼) cash and promissory notes made payable to the order of said Insurance Company in accordance with the conditions and agreements as shows by our installment subscription blank.

"(5) It is especially agreed that the Insurance Company is to pay said special agents, for a period of five weeks from date, weekly, forty dollars. ($40.00), or a total of two hundred dollars ($200.00), said amounts being an extra allowance additional to and exclusive of said above set forth commissions of $4.50 per share; that the Insurance Company is to furnish office and desk room and necessary furniture, and all necessary supplies, literature, date, information, and blanks needed in the prosecution of selling of said stock; that the office of said special agents shall be in the same building with the home office of said Insurance Company, and shall not be removed therefrom without the consent of the said Insurance Company; that the supplies and furniture furnished are and shall continue to be the property of the said Insurance Company; that no stock shall be issued until the full purchase price thereof shall have been paid by cash; and that the said Insurance Company will issue stock when so paid for, as aforesaid, to all persons whose applications shall have been received by said special agents and approved by the proper officer of said Insurance Company.

"(6) That the said special agents shall prosecute the sale of said stock with due diligence, giving their entire time to the sale of said stock.

"(7) It is understood and agreed that all applications for the sale and handling of said stock, and also all inquiries and matters pertaining in any way to said stock department, received by said Insurance Company, shall forthwith be referred to said special agents.

"(8) It is agreed that any cash advances, other than set forth in section 5, made to special agents, shall be repaid by said special agents from all accepted stock sales until existing indebtedness due to such shall have been liquidated.

"(9) It is expressly agreed that the following advances shall be made the said special agents, to wit: $160.00 on this date, receipt hereby acknowledged, and a further sum weekly of $60.00 for a period of four additional weeks. This advance is over and above the allowance set forth in clause 5 above.

"(10) It is expressly understood that this contract has nothing to do with any unfinished business of our old issue of $100,000.00 capital stock, and any old issue offered for sale, except such amount as shall be sold by the president shall be effected through the said special agents."

Thereafter, on November 6, 1913, the following letter was written by the president of the Insurance Company to the special agents:

"Tupelo, Miss., Nov. 6, 1913.

"Messrs. Davis & Pleasants, Calhoun City, Miss.—Gentlemen: Since talking with you Monday I have received our stock sales record. The poor showing I find, and approach of the examination day, compels me to get busy doing all I can to increase our stock sales. I wrote you under date of September 22d calling your attention to the slow progress you were making in selling the new issue of stock, advising that sales were not satisfactory, and

unless you arranged to increase these sales to something like $30,000 per month we would be forced to cancel the contract made with you under date of July 12, 1913, on the grounds of your sales not being satisfactory. During the past month our record show sales of only $2,750. So you are advised that from and after this date your contract with the Cotton States Life Insurance Company, of Tupelo, Mississippi, under date of July 12, 1913, to act as special agents to sell $50,000 of it [the] capital stock for the total sum of $125.00, is this day canceled.

"You are further advised you can continue sales as long as they are satisfactory with the company at $25.00 per share—full settlement to be sent in to the home office that show not less than one-fourth in cash and note or notes for balance in accordance with the conditions and agreements as shown by our installment subscription blanks. All sales and settlements sent in to be subject to the approval of the company. You are to receive the amount of $4.50 for each share personally sold that is approved and accepted by the company, but without any commission claim against the company on sales made through salesmen employed by the company.

"Yours resp.,                                    E. C. Hinds, President."

Following this letter, purporting to cancel the contract, the parties on November 15, 1913, made an amendatory agreement as follows:

"Whereas, a controversy has arisen between the parties to this contract as to the respective rights and obligations of the respective parties thereto; and whereas, such controversy and difference has been settled and compromised; Now, therefore, to that end this compromise agreement is made, the terms of which are as follows:

"The contract of July 12, 1913, made and entered into by the parties hereto, is hereby amended in the following respects:

"First. That said special agents agree that said Insurance Company shall have the right to employ direct as many stock salesmen as it may see fit: Provided, said Insurance Company shall be responsible for such employment, and finance such stock salesman when they may deem advisable, and said special agents shall be without responsibility in any respect with reference to stock salesmen so employed by said Insurance Company. The territory to be occupied by said stock salesmen shall be subject to the approval of said special agents.

"Second. Said special agents are to have the right to employ stock salesmen, and finance them, and be responsible for them, and fix the territory in which they shall operate.

"Third. All stock salesmen, whether employed by said Insurance Company or by said special agents, shall receive as compensation for their services four dollars ($4.00) per share on all stock sold by them, and said Insurance Company agrees to pay said special agents on all such stock so sold by said stock salesmen an additional overwriting commission of seventy-five cents ($0.75) per share; on all stock sold by said special agents they are to receive a commission of four dollars and fifty cents ($4.50) per share as per original contract of July 12, 1913.

"Fourth. It is agreed by the parties hereto that all sales made by said stock salesmen, whether employed by said Insurance Company or said special agents, shall be reported to said special agents at the end of each week by said Insurance Company, with complete specifications with reference thereto.

"Fifth. Except herein modified by this contract, said contract entered into on the 12th day of July, 1913, between the parties hereto stands; this amendment taking effect on November 17, 1913.

"This contract signed in triplicate this the 15th day of November, 1913."

On December 24, 1913, the special agents instituted suit against the Insurance Company, assigning breaches of contract and claiming damages. To their declaration, the Insurance Company filed a general demurrer, which, coming on to be heard, was on April 19, 1914, sustained by the court, with leave to file an amended declaration within 60 days; and thereafter an amended declaration was filed, which was again demurred to, and on October

4, 1915, was sustained, and, the plaintiff declining to further amend, the suit was dismissed.

The plaintiffs in error, who will be hereinafter referred to as plaintiffs, sued the defendant in error, who will be designated as defendant, for damages for breach of the aforesaid contract. The defendant interposed a demurrer to the plaintiff's declaration, which was sustained by the court, and leave given the plaintiffs to file an amended declaration, which was accordingly done, to which amended declaration defendant demurred again, which demurrer was sustained by the court, with leave to file an amended declaration, which leave the plaintiffs declined to take advantage of, and thereupon final judgment was entered dismissing plaintiffs' suit, from which judgment this writ of error is prosecuted.

In the amended declaration, after setting out the contract hereinbefore given, plaintiffs aver and assign breaches of the same as follows:

"First. In the beginning of their efforts to sell said stock, and covering the period that the defendant was to advance and pay to the plaintiffs said weekly installments of $100, it was absolutely necessary plaintiffs should receive said weekly installments promptly, in order to pay their expenses incident to the sale of said stock, and which defendant agreed to pay promptly, because plaintiffs had no means of their own and could get none elsewhere, but failed to do so, delaying such remittances from one to six days after they were due, thereby delaying and retarding the plaintiffs in their efforts to sell said stock, against which delay they time and again protested to the defendant; such delays causing plaintiffs much loss of time and unnecessary expenses.

"Second. The defendant breached said contract by authorizing and permitting one Edward De Zonia, Jr., employed in the defendant's insurance department and who was not a licensed stock salesman, and therefore had no authority so to do, to sell eight shares of said stock to Dr. C. Moore, eight shares to A. J. Moore, both of Itta Bena, Mississippi, such sales having been made on the 28th day of October, 1913, and accepted by the defendant, because by the terms of said contract, Exhibit A, the plaintiffs had the exclusive right and authority to sell said entire additional stock of $50,000, as well as the 700 shares of the original stock, which had been surrendered by the purchasers thereof and turned back to the defendant, as hereinbefore set out, except what was sold to the latter by the president of said defendant company personally.

"Third. The defendant breached the fourth paragraph of said contract, which provided, among other things, that the defendant would not receive or appropriate stock sales and settlements therefor, that showed less than one-fourth of the amount of such sales paid in cash, and notes for the balance due not later than six months after such sales, by permitting one G. Exum, a stock salesman, to make settlements for stock sales by taking notes for unpaid balances running longer than said period of six months.

"Fourth. The defendant breached paragraph VII of said contract, which provided that all applications for the sale and handling of said stock, and all inquiries and matters pertaining in any way to said stock department, received by the defendant, should be immediately referred to the plaintiffs, by persistently refusing so to do, although the plaintiffs time and again demanded that this paragraph of the contract be complied with by the defendant.

"Fifth. The defendant breached said contract on the 6th day of November, 1913, by undertaking to discharge the plaintiffs from their employment, as shown by the defendant's letter of that date to the plaintiffs, a copy of which is hereto attached, marked Exhibit B, as a part of this declaration; the defendant basing its right to cancel said contract on the ground that the volume of stock sales made by the plaintiffs was not satisfactory, when in truth and in fact such stock sales were satisfactory, and furthermore, if not, said contract did not authorize a cancellation on that ground.

"Sixth. After receiving said letter, Exhibit B, from the defendant, the plaintiffs and the defendant entered into what the plaintiffs supposed was a settlement of their difference at that time, which settlement and adjustment

was evidenced by an amendment to said original contract, Exhibit A, which was entered into by the plaintiffs and the defendant on the 15th day of November, 1913, a copy of which amendment to said original contract is hereto attached, marked Exhibit C, as a part hereof. After the execution of said amendment to said contract plaintiffs in good faith went to work for the purpose of completing the sale of said stock, and continued therein until December 8, 1913, when plaintiffs aver that the defendant breached and put an end to said contract, both the original and amendment, in this, to wit:

"(a) The breach numbered second above to the original contract was a breach to the entire contract as amended, because said stock sales so made by said De Zonia were concealed by the defendant from the plaintiff prior to and at the time said amended contract was made, and not ascertained by the plaintiffs until about December 8, 1913, notwithstanding such conduct was a violation by the defendant of paragraph VII of said original contract, Exhibit A, as well as paragraph IV of the amendment, Exhibit C, which paragraph IV provides that all sales of stock made by stock salesmen, whether employed by the defendant or the plaintiffs, should be reported at the end of each week by the defendant to the plaintiffs, with complete specifications with reference thereto.

"(b) The defendant breached said contract, original and amended, by refusing to pay the plaintiffs their commissions as provided in said contract on the following stock sales: N. A. Cramer, on whose stock purchase plaintiffs' commissions were $180; ———— Johnson, on whose stock purchase plaintiffs' commissions were $30; Dr. C. C. Moore and A. J. Moore, on whose stock purchase plaintiffs' commissions were $72—aggregating $282, which sums they demanded of the defendant, and which the defendant refused to pay, although under the terms of said contract said sums of money have long since been due and payable to the plaintiffs, and plaintiffs were thereby prevented from going on with said stock sales for the want of sufficient means, which they had not themselves, nor could get from any other source. Up to the 8th day of December, 1913, when the defendant finally put an end to said contract, there had been sold 1,318 shares of said additional stock covered by the plaintiffs' said contract, and there remained to be sold under said contract 3,682 shares, which the defendant by its breach of said contract wrongfully and unlawfully prevented the plaintiff from selling and receiving their commissions thereon as provided in said contract, although plaintiffs were ready and willing to carry out said contract, and would have done so except for said breaches. Therefore by virtue of defendant's breach of its said contract as aforesaid the plaintiffs have lost their commissions as provided on the said 3,682 shares of stock, which amounts to the sum of $16,569, for which amount the plaintiffs sue, and demand judgment of the defendant, with the costs of this cause."

The demurrer to the amended declaration is as follows:

"Now comes the defendant, by its attorneys, and demurs to the amended declaration filed in this cause, and for grounds of demurrer assign the following:

"First. The contract sued on makes it a condition precedent to plaintiffs' right to the compensation sued for to have sold the said additional stock, and they fail to aver how or in what manner the several alleged breaches, or either of them, prevented said plaintiffs from performing said conditions precedent.

"Second. No breach of the contract sued on is definitely and specifically alleged, nor is, any renunciation of said contract by defendant, by either word or conduct, averred.

"Third. No special, definite, and certain damage to plaintiffs is alleged.

"Fourth. If there be any certain, definite, or special damage alleged, it is only to the amount of $282, while this suit is brought in the United States District Court on the grounds of diverse citizenship, and the amount in controversy must be $3,000 to give the court jurisdiction.

"Fifth. The damages claimed are not shown to have naturally and approximately resulted from the alleged breaches complained of, nor any of them.

"Sixth. This seems to be an effort in a court of law to modify and reform a written contract.

"Seventh. It is not shown how defendant put an end to said amended contract on December 8, 1913, nor how defendant prevented plaintiffs from performing said contract.

"Eighth. It is not shown what it would have cost plaintiffs to have sold said additional stock, nor what the expense of said sale would have been to them, nor what the profits to plaintiffs would have been, had they performed said contract by selling said additional stock, nor what time it would have required to have sold said additional stock, nor what plaintiffs could or should have earned during said time, nor are any facts alleged from which these several things can be ascertained, or determined.

"Ninth. As to all that part of the declaration which sets out breaches of the first contract, and particularly breaches particularized in the amended declaration under first, second, third, fourth, fifth, and sixth alleged breaches, because all this is immaterial, irrelevant, and tends to becloud and confuse the issue, and because none of these alleged breaches of the contract, before the amended contract was made, constitute any breach of the contract as amended, and because the declaration, and the contracts made a part thereof, show that all these matters were compromised and settled in the making of the new or amended contract, and that the old contract was merged into the new supplemental contract, and all the alleged breaches theretofore occurring before the making of the supplemental contract were compromised and settled by the parties."

The opinion of the court below, found in the transcript, is as follows:

"Upon careful reading of the amended declaration, in connection with the interesting briefs of counsel for the respective parties to this suit, and review of the authorities cited, the court is forced to the conclusion that the demurrer to the amended declaration should be sustained, as the said amended declaration does not cure the uncertainties and defects of the original declaration, as it cannot be understood how defendant could be liable in the sum of some $16,000 for loss of profits, when from the declaration and contracts, at least from the court's viewpoint, such loss was occasioned by defendant's failure to pay plaintiffs $282 as commissions, the only definite liability disclosed; the contract as to time of payment of such commissions being silent.

"Counsel for opposing parties cite the case of Roehm v. Horst et al., 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, in support of their contentions, which authority, in the judgment of the court, is in favor of defendant in the case at bar."

W. D. Anderson, of Tupelo, Miss., for plaintiff in error.

J. Q. Robins and J. M. Thomas, both of Tupelo, Miss., for defendant in error.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). The contract involved in this case is interdependent. Its successful execution required co-operation and the prompt performance of the covenants therein by each party. It is apparent from the subject-matter of the whole contract, and particularly from the covenants in the fourth, fifth, seventh, and ninth clauses of the original contract, that time was of essence in the performance of the undertakings of both parties.

Without considering alleged breaches of the original contract, claimed to have been condoned by the compromise and agreements in the amendment, we find that clear and unequivocal breaches of the contract as amended are assigned in the sixth paragraph of the amended declaration, to wit: The failure to pay when due and the refusal to pay

on demand the earned commissions of $282 on sales of stock to Cramer and the Moores, and the allegation that on the 8th day of December the defendant finally put an end to the contract. These breaches, admitted by the demurrer, give the plaintiffs a clear right of action.

Their prayer is for the sum of $16,569, the amount of commissions they would have earned if the defendant had not breached the contract. How much of this they may be able to prove to the satisfaction of the court and jury remains to be seen. The ad damnum is sufficiently alleged to give the court jurisdiction, and it is not necessary to determine whether the plaintiffs can recover any damages under the provision in the amended contract:

"That on all stock sold by the defendant's stock salesmen the plaintiffs should be paid a commission of 75 cents per share."

The judgment of the District Court is reversed, and the cause is remanded, with instructions to overrule the demurrer and thereafter proceed as the law requires.